UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

James E. Rand

    v.                              Civil No. 04-cv-382-JD
                                    Opinion No. 2006 DNH 035
Henry Simonds et al.

O R D E R

James E. Rand, proceeding pro se, has sued three present or
former employees of the Merrimack County House of Corrections
(the "MCHC"), alleging that they were deliberately indifferent to
his medical needs during his prior detention in that facility.
One of the defendants, Henry Simonds, has moved for summary
judgment on the ground that Rand failed to exhaust administrative
remedies as required by the Prison Litigation Reform Act, 42
U.S.C. § 1997e ("the PLRA").  Through separate motions, Simonds
also seeks dismissal of Rand's case (1) as a sanction for his
failure to provide certain interrogatory responses despite a
court order and (2) for failing to disclose an expert witness to
testify in support of his claim.

The other defendants, Carole Anderson and Richard Doucet
(the "supervisory defendants"), have separately moved for summary
judgment on the basis of Rand's failure to exhaust administrative
remedies.  They also seek summary judgment on the independent
grounds that Rand cannot prove they were deliberately indifferent

to any serious medical need on his part and that they enjoy qualified immunity.  Finally, the supervisory defendants have filed a "supplemental motion for summary judgment" arguing that Rand cannot succeed on his claim without expert testimony, which he has failed to disclose by the court-imposed deadline.  Rand has not responded to any of the defendants' motions, despite having been granted an extension of time to do so.[1]

## Background

Rand entered the MCHC on February 13, 2004, following "a high speed car chase that ended with [his] losing control of his vehicle [and] crashing into trees."  Compl. ¶ 7.  At that time, as well as during all of the events at issue here, Anderson was the superintendent of the MCHC, while Doucet was the assistant superintendent.  Before going to the MCHC, Rand was transported from the scene of the accident to Concord Hospital, where he underwent x-rays and other testing.  As a result of this "very brief exam," Rand was diagnosed as being "in good medical health," aside from some minor cuts and bruises.  Id. ¶ 9.

_____

[1]Although Rand's time to respond to Simonds's motion to dismiss for failing to disclose an expert witness, and the supervisory defendants' supplemental motion for summary judgment, has yet to run, those motions are moot, for reasons which will appear.

Phyllis Butler, a nurse at the MCHC who also serves as the head of its health services department, first examined Rand on February 14, 2004.  She noted that he complained of muscle soreness in his neck and back as a result of the accident but otherwise described his "General Health" as "good."  Butler Aff. ¶ 9.  Consistent with the orders he received upon his discharge from Concord Hospital, Rand continued to treat his soreness with Tylenol for a few days.  On February 17, 2004, however, he requested medical attention for swelling he noticed in his back near his right shoulder.  The nurse who examined Rand found no swelling, but prescribed ibuprofen and a muscle relaxant.  The next day, Simonds, a physician's assistant at the MCHC, added Ultram, an analgesic, to Rand's drug regimen.

Rand asked for further medical attention on February 23, 2004.  Simonds, who saw Rand the next day, told him "that the soreness and pain was normal after getting involved in a car accident" and suggested that he continue to treat those symptoms with Ultram.  Compl. ¶ 22.  In a follow-up appointment on February 27, 2004, Rand reiterated his complaints of pain in the area of his right shoulder.  Noting "no external sign of injury" and a "full range of motion," Simonds diagnosed Rand with a muscle strain secondary to the accident and renewed his prescriptions for ibuprofen, Flexeril, and Ultram.  Butler Aff.

3

¶ 12.  Rand alleges that Simonds "couldn't provide an explanation for the problems [Rand] was having" and should have referred him to a specialist at that point.  Compl. ¶ 31.

Just over a week later, on March 8, 2004, Rand again sought medical attention, complaining that he could not raise his right arm and that he had heard a popping noise in his right shoulder. Patricia Lee, the physician's assistant at the MCHC who saw Rand at this time, observed that he could not lift his right arm more than ninety degrees or extend it behind his back.  She diagnosed Rand with a rotator cuff tear and ordered him to continue taking Tylenol and Ultram.  According to Rand's medical chart, Lee also "suggested" that he consult with an orthopedist with a view toward possible surgery.  Butler Aff. ¶ 14.

Anderson subsequently discussed Lee's "recommendation" with Butler, "who believed a more conservative approach, with use of prescriptions and passage of time, would better assess the complaints."  Anderson Aff. ¶ 12.[2]  Although both Anderson and Butler have submitted detailed affidavits in support of the supervisory defendants' summary judgment motion, neither claims to have spoken to Lee about her "recommendation" that Rand see an

---

[2]All citations to "Anderson Aff." refer to the amended affidavit she filed in support of the supervisory defendants' motion for summary judgment.

4

orthopedist, or the reasons for it.  Furthermore, Anderson recalls that she and Butler "discussed having Dr. Rodd, the jail's physician and medical director, review the case," id., but neither Anderson nor Butler indicates whether this in fact occurred.[3]  On March 11, 2004, however, Butler entered a note into Rand's chart stating, "Will hold off on surgical consult for now--awaiting court rulings/court dates."  Butler Aff. ¶ 15.

Butler saw Rand again on March 19, 2004, when he sought attention for complaints of increased pain in his right shoulder, accompanied by occasional pain and numbness in his right arm and hand.  Butler "told him per jail policy this pre-existing condition will not be authorized for surgical intervention" and, in response to his requests for "at least an x-ray or [to] have the shoulder scoped to find out if it is a rotator cuff tear, told him he would have to write directly to Carole Anderson for authorization . . . ."  Id. ¶ 16.  Butler encouraged Rand to keep taking the prescribed drugs for his pain, but he protested that they were ineffective and expressed concern over "liv[ing] on pain medications the whole time I'm here."  Id.

Anderson attests that Rand never made a "formal request" to

---

[3]Doucet recalls that Anderson "advised [him] to confirm for the medical department that Mr. Rand would not be transported for an outside consultation at that time," which Doucet did.  Doucet Aff. ¶¶ 7-8.  Doucet provides no further details in this regard.

her to authorize the treatment he desired.  Anderson Aff. ¶ 13.

He had, however, submitted a medical request slip on March 12,

2004, "about discomfort in his right arm and whether he would be

referred to a specialist for examination (as mentioned by PA

Lee)."  Id. ¶ 15.  In addition, on June 10, 2004, Patricia Moyer,

an investigator for the public defender representing Rand on the

criminal charges against him, telephoned Doucet, the MCHC's

assistant superintendent, "about Mr. Rand's medical care at the

jail," specifically his complaints of pain in his shoulder.

Doucet Aff. ¶ 11.  Doucet summarized his conversation with Moyer

in a letter he sent her later that day, stating:

> As I explained to you, this is a pre-existing condition
> and if [Rand] has insurance or funds to cover the cost
> of the exam he is requesting, we will make the
> necessary arrangements.  There is no doctor's order for
> a surgical consult with orthopedics; there is only a
> recommendation by Physician Assistant Patricia Lee.

Id. ¶ 12.  Moyer wrote to Anderson on both July 26, 2004, and

December 8, 2004, requesting, inter alia, "a copy of the jail's

policy for non-treatment of pre-existing conditions."  Mot. J.

Defs.' Ans. Admis., Ex. F, at INM 000111, MED000055; see also

Anderson Aff. ¶¶ 20, 22.  Meanwhile, Rand commenced this action

on October 7, 2004.  On December 13, 2004, Anderson sent a letter

to Rand, with a copy to Moyer, stating, "[o]ur policy regarding

medical occurrences is that we do not treat conditions that do

6

not require treatment.  However, we do treat any condition that
needs treatment."  Anderson Aff. ¶ 24.

   Neither Anderson nor Doucet had explained the MCHC's
medical care policy with reference to the language set forth in
the inmate handbook then in effect.  Under that policy, "[n]o
inmate [could] be refused necessary medical treatment for
financial reasons."  Anderson Aff. ¶ 7, Ex. A, at 7.  The
handbook defined "necessary medical treatment" as

> [a] professional judgment made by a Physician Assistant
> that the requested service or medication is medically
> appropriate and cannot be safely and humanely postponed
> until after the inmate's period of incarceration ends.
> Treatment that the Staff Physician deems to be elective
> may be refused on the grounds that it is not medically
> necessary.

Id. Notably, this policy gave neither the administration nor the
head of the health services department any role in deciding what
constituted "necessary medical treatment," but left that
determination to a physician's assistant, subject to the approval
of the staff physician.  Nor did it mention, as a factor in
determining whether care for a condition was medically necessary,
whether it predated the inmate's arrival at the MCHC.

   In any event, when Lee examined Rand on November 11, 2004,
she noted that his "rotator cuff tear [was] much improved" and
that his right shoulder showed "no crepitus and a much more

7

flexible range of motion."[4]  Butler Aff. ¶ 29.  This was the only
time Rand sought medical attention for his shoulder between March
19, 2004, and December 9, 2004.  By that time, Rand had provided
Lee with additional records of his visit to Concord Hospital on
the night of his arrest, which indicated a possible cervical
injury.  Lee then scheduled a CT scan of Rand's cervical spine
and, upon getting the results, made an appointment for Rand for
evaluation by an orthopedic surgeon.

On January 14, 2005, Rand saw Dr. Russell Brummett, who
diagnosed him with "[p]osttraumatic cervical strain with previous
C5 injury."  Butler Aff. ¶ 44.  Noting that "this is something
that should be treated very conservatively" and that Rand did
"not present with any particular risk for any neurologic injury,"
Brummett "recommend[ed] a physical therapy regimen . . . ."  Id.
Rand subsequently received physical therapy from an outside
provider on a number of occasions in January and February, 2004.
Through this regimen, Rand "made good progress with increas[ing]
mobility and strength," but "minimal progress with decreasing
pain/discomfort," in his right shoulder.  Id. ¶ 56.

Rand saw a different orthopedist, Dr. FitzMorris, on

---

[4]Crepitus, in the relevant sense, is "the grating sensation
caused by the rubbing together of the dry synovial surfaces of
joints."  Dorland's Illustrated Medical Dictionary (30th ed.
2003), at 433.

February 23, 2004.  FitzMorris did not "appreciate any acute cervical spine injury related to [Rand's] motor vehicle accident," adding that Rand's "insight [was] poor" and that "[s]urgery [was] certainly not the answer."  Butler Aff. ¶¶ 58–59.  Instead, FitzMorris suggested a decrease in Rand's Ultram intake and additional exercises.

On March 31, 2004, Rand discussed increasing his medications and getting a "possible third opinion" with a nurse at the MCHC.  Butler Aff. ¶ 64.  Lee, following a consultation with Rodd, the jail's medical director, referred Rand to FitzMorris for another evaluation of his right shoulder and cervical vertebrae.  Rand underwent an MRI on the shoulder on April 27, 2005, which did "not suggest a complete tear" or "recent bony injury" but rather "[a]rthritic changes."  Id.  Upon review of the results, Lee concluded that the "MRI show[ed] no obvious injuries including tears."  Id. ¶ 71.  After FitzMorris examined Rand again on May 18, 2005, the doctor agreed that Rand "had essentially a normal MRI scan" and no "significant rotator cuff tear."  Id. ¶ 75.  FitzMorris again "recommended that [Rand] wean himself from any analgesic medication and start using the shoulder more and more," but did "not recommend surgery or any other significant orthopaedic intervention."  Id.  Thus, while Rand continued to receive treatment for his shoulder pain from the MCHC medical

9

staff over the next several months, it consisted primarily of
tinkering with his medications, without further testing or
consultation from outside providers.[5]

After reviewing the complaint in this matter under 28 U.S.C.
§ 1915A and L.R. 4.3(d)(2), the magistrate ordered that Rand be
allowed to proceed on his claim (1) that Simonds was deliberately
indifferent to Rand's "severe shoulder injury and related pain"
by failing to refer him to a specialist or other physician in
February, 2004, Order (Feb. 10, 2005), at 8-9, and (2) that
Anderson and Doucet were similarly indifferent in their "tacit
condonation" of Simonds's alleged misfeasance and their refusal
to authorize the treatment Lee had recommended.  Id. at 11.  None
of the parties objected to the magistrate's order.

### Standard of Review

On a motion for summary judgment, the moving party has the
burden of showing the absence of any genuine issue of material
fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
If the movant does so, the court must then determine whether the
non-moving party has demonstrated a triable issue.  Anderson v.

---

[5]Rand did, however, resume physical therapy with an outside
provider on November 30, 2005, though it is unclear for how long.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In ruling on a
motion for summary judgment, the court must view the facts in the
light most favorable to the non-moving party, drawing all
reasonable inferences in that party's favor.  E.g., J.G.M.C.J.
Corp. v. Sears, Roebuck & Co., 391 F.3d 364, 368 (1st Cir. 2004);
Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004).  The
court must enter summary judgment, "after adequate time for
discovery and upon motion, against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which the party will bear
the burden of proof at trial."  Celotex, 477 U.S. at 322.

Although Rand has not filed any objection to the defendants'
summary judgment motions, the court cannot grant them on that
basis alone.  Instead, "it must assure itself that the moving
party's submission shows that 'there is no genuine issue as to
any material fact and the moving party is entitled to judgment as
a matter of law.'"  NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7
(1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)).

### Discussion

I.   Whether Rand Exhausted His Administrative Remedies

Both Simonds and the supervisory defendants move for summary
judgment on Rand's claim on the ground that he failed to exhaust

his administrative remedies as required by the PLRA.  The PLRA
provides that "[n]o action shall be brought with respect to
prison conditions under . . . any . . . Federal law, by a
prisoner . . . until such administrative remedies as are
available have been exhausted."  42 U.S.C. § 1997e(a).  The
Supreme Court has held that this requirement "applies to all
inmate suits about prison life, whether they involve general
circumstances or a particular episode, and whether they allege
excessive force or some other wrong."  Porter v. Nussle, 534 U.S.
516, 532 (2002).  Rand's claim therefore falls within the ambit
of the PLRA's exhaustion requirement.  See, e.g., Witzke v.
Femal, 376 F.3d 744, 751 (7th Cir. 2004).

Where section 1997e(a) applies, but the plaintiff has
nevertheless failed to exhaust available administrative remedies
prior to bringing suit, his or her claims must be dismissed
without prejudice.  Medina-Claudio v. Rodriguez-Mateo, 292 F.3d
31, 36 (1st Cir. 2002).  The First Circuit follows the majority
rule treating nonexhaustion as an affirmative defense, placing
the burden on the defendant to prove that a plaintiff failed to
exhaust available administrative remedies.  Casanova v. Dubois,
304 F.3d 75, 77 & n.3 (1st Cir. 2002); Goodrich v. Rouleau, 2003
DNH 48, 2003 WL 1392433, at *2 (D.N.H. Mar. 20, 2003).  Whether
an inmate has done so presents a question of law, although the

answer may depend on disputed factual issues.  <u>Snider v.
Melindez</u>, 199 F.3d 108, 113 (2d Cir. 1999); <u>see also</u> <u>Mitchell v.
Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003).

The defendants point out that Rand never complained about
their alleged indifference to his serious medical need by filing
a grievance as contemplated by the inmate handbook.  Under the
heading "Grievance Procedures," the handbook in effect during the
events at issue here stated:

> Inmate's [*sic*] incarcerated at the Merrimack
> County Department of Corrections have the right and
> opportunity to submit grievances to the county
> authorities as well as other officials of the State of
> New Hampshire without fear of adverse actions.  The
> inmate grievance procedure is a formal method for
> resolving "misinterpretations" and/or "misapplications"
> of rules or alleged violations of Department Policy &
> Procedures.
>
> Officers will supply the necessary paperwork or
> information to any inmate that seeks to submit a
> grievance.  The Assistant Superintendent will then
> assign the appropriate personnel to the investigation
> of the grievance and respond back in writing to the
> inmate.

Anderson Aff. ¶ 7, Ex. A, at 27.  The defendants read this
passage as giving "instructions" with which Rand was "required to
comply" in order to exhaust the administrative remedies available
to him within the meaning of the PLRA.  Mem. Supp. Super. Defs.'
Mot. Summ. J. at 6-7.  The court disagrees.

It is generally true that "[t]o exhaust remedies, a

prisoner must file complaints and appeals in the place . . . the prison's administrative rules require." <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (7th Cir. 2002).  Here, however, the "rules" on grievance procedures set forth in the inmate handbook did not appear to "require" that a grievance take any particular form. Instead, the handbook described the inmate grievance procedure as "<u>a</u> formal method" of resolving complaints and informed inmates that they "have the right and opportunity to submit grievances to the county authorities . . . ." (emphasis added).  The handbook, then, did not fairly suggest that the grievance procedure was the only way, or even the correct way, for inmates to complain about their treatment at the MCHC.[6]

Furthermore, in the "Medical Procedures" section, the handbook in effect at the relevant time stated simply that "[a]n inmate requesting medical services shall submit a signed Medical Request Form" and that "[a]ny disputed charges may be appealed in writing to the superintendent within three days, excluding weekends and holidays," without making clear how these requirements intersect with the grievance policy.  Anderson Aff. ¶ 7, Ex. A, at 8.  Rand did submit a medical request form, on

---

[6]Similarly, the grievance form itself simply contains spaces for the inmate to write his name, the date, and the "Nature of Grievance," together with additional blanks to be filled in by prison officials.  Mem. Supp. Simonds Mot. Summ. J., Ex. E.

March 12, 2004, asking to be referred to a specialist in
accordance with Lee's advice.

   Courts have not held inmates to the purported requirements
of prison grievance procedures which are not clearly spelled out
in the applicable regulations or elsewhere.  See Spruill v.
Gillis, 372 F.3d 218, 233-34 (3d Cir. 2004) (ruling that inmate's
failure to request monetary relief in grievance did not
constitute non-exhaustion where prison regulation stated that
grievance "may" include such a request; "[n]othing in the
Grievance System Policy would have put [him] on notice that he
had to ask for money damages--or any particular form of relief at
all"); In re Bayside Prison Litig., 190 F. Supp. 2d 755, 771
(D.N.J. 2002) (denying motion to dismiss for non-exhaustion,
though inmate did not file grievance in accordance with prison
procedure, where "handbook creates the clear impression that use
of . . . procedure is optional, not mandatory"); accord Giano v.
Goord, 380 F.3d 670, 678-79 (2d Cir. 2004) (treating inmate's
failure to file grievance over allegedly unfair disciplinary
proceeding as "justified" where prison directive described
outcome as non-grievable).  Relatedly, this court and others have
recognized that prison officials may prevent an inmate from
utilizing an administrative remedy--making the remedy not
"available" within the meaning of section 1997e(a)--by telling

15

the inmate that his complaint can be grieved only through another avenue.  See Beltran v. O'Mara, 405 F. Supp. 2d 140, 154 (D.N.H. 2006) (citing cases).

Here, when Butler told Rand that his shoulder injury would "not be authorized for surgical intervention," she did not refer him to the grievance procedure, but "told him he would have to write directly to Carole Anderson for authorization . . . ." Butler Aff. ¶ 16.  Although Rand did not explicitly request "authorization" from Anderson in response, Moyer, the investigator for Rand's criminal defense attorney, subsequently challenged the MCHC's refusal to refer him to an outside provider in a telephone conversation with Doucet, the assistant superintendent.  Moyer also wrote directly to Anderson, on Rand's behalf, questioning the MCHC's stated policy of refusing to treat inmates for pre-existing conditions.

The overarching purpose of the PLRA's exhaustion requirement is to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  Porter, 534 U.S. at 524-25.  Moyer's communications questioning the denial of outside care to Rand gave the supervisory defendants just such an opportunity. Moreover, they took advantage of the opportunity, responding to Moyer with explanations of the decision, rather than rejecting

16

her inquiries as improper because they did not take the form
envisioned by the inmate grievance policy.[7]  In light of these
circumstances, and the conflicting guidance found in the inmate
handbook and Butler's advice as to how Rand should have
complained about his medical treatment, the fact that he did not
file a formal grievance on the subject is irrelevant.  To
paraphrase the Third Circuit, section 1997e(a) did not require
Rand to "jump through any further administrative hoops to get the
same answer" to his complaint from the very same administrators.
Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000).  The court
concludes that Rand administratively exhausted his claim of
inadequate medical care against the supervisory defendants.

Simonds, however, separately argues that the claim against
him could not have been exhausted through Moyer's communications
with Anderson and Doucet.  Rand alleges that Simonds was
deliberately indifferent in failing to refer him to a specialist
outside the jail for his shoulder injury in February 2004.  As
Simonds points out, this occurred before Lee's recommendation

---

[7]Some courts have held that an inmate's failure to comply
with applicable grievance procedures in complaining about his
treatment amounts to non-exhaustion only if his grievance is
rejected on that basis.  E.g., Conyers v. Abitz, 416 F.3d 580,
585 (7th Cir. 2005); Griswold v. Morgan, 317 F. Supp. 2d 226, 230
(W.D.N.Y. 2004).  Given the other reasons not to hold Rand to the
requirements of the MHCH grievance policy in this case, the court
need not decide whether to take such an approach here.

that Rand receive outside care for his shoulder and the
subsequent decision against providing that care.  It was that
decision, rather than Simonds's alleged failure to recommend
outside care at an earlier time, which Moyer challenged in her
correspondence with the supervisory defendants.

As this court recently observed, while section 1997e(a) does
not itself require inmates to "'lay out the facts, articulate
legal theories, or demand particular relief,'" in registering
their complaints at the administrative level, they must
nevertheless "'provide enough information about the conduct of
which they complain to allow prison officials to take appropriate
responsive measures.'"  <u>Beltran</u>, 405 F. Supp. 2d at 151 (quoting
<u>Strong v. David</u>, 297 F.3d 646, 650 (7th Cir. 2002), and <u>Johnson
v. Testman</u>, 380 F.3d 691, 697 (2d Cir. 2004)).  Moyer's
complaints to the supervisory defendants about the denial of
outside care for Rand's shoulder injury, insofar as the summary
judgment record indicates, did not allege any misfeasance on
Simonds's part, or even mention him, by name or otherwise.  Those
complaints, then, did not provide the defendants "sufficient
notice of [Rand's] concerns [over Simonds's treatment] to have
been able to deal with them administratively."  <u>Braham v. Clancy</u>,
425 F.3d 177, 184 (2d Cir. 2005).  Because Rand did not
administratively exhaust his claim against Simonds as required by

the PLRA, that claim is dismissed without prejudice.  Similarly,
Rand's claim against the supervisory defendants is dismissed
without prejudice insofar as it arises out of their "tacit
condonation" of Simonds's actions.  Order (Feb. 10, 2005), at 11.

II.   Whether There is a Factual Issue as to Rand's Claim

     The supervisory defendants also seek summary judgment on the
ground that the record demonstrates, as a matter of law, that
they were not deliberately indifferent to any serious medical
need on Rand's part.  "[C]laims by pretrial detainees alleging
denials of medical assistance essentially turn on whether the
challenged official action constituted deliberate indifference to
a serious medical need."  Mahan v. Plymouth County House of
Corrs., 64 F.3d 14, 17 (1st Cir. 1995) (internal quotation marks
omitted); see also Gaudreault v. Municipality of Salem, 923 F.3d
203, 208 (1st Cir. 1990).  This test "has both an objective
component (was there a sufficiently serious deprivation?) and a
subjective component (was the deprivation brought about in wanton
disregard of the inmate's rights?)."  Desrosiers v. Moran, 949
F.2d 15, 18 (1st Cir. 1991) (discussing test in Eighth Amendment
context); see also Mahan, 64 F.3d at 18.

     The supervisory defendants argue that Rand cannot establish
either the objective or subjective elements of his claim, i.e.

(1) that he had any "serious medical problem" or (2) that they
were deliberately indifferent to it.  Super. Defs' Mot. Summ. J.
¶¶ 4-5.  As to the second point, the supervisory defendants argue
in their summary judgment motion that they simply "deferred to
medical providers" when they initially denied Rand outside care
for his shoulder injury.  Id. ¶ 5.  But Anderson pointedly did
not defer to Lee's advice that the MCHC provide such care.

　　　Relying on the fact that Lee wrote "surgical consult/
orthopedic suggested," rather than ordered, on Rand's chart,
Butler Aff. ¶ 14 (emphasis added), Anderson maintains that she
"never overruled any doctor's or physician's order to transport
Mr. Rand for outside care."  Anderson Aff. ¶ 33.  It should be
noted at the outset that this distinction does not have the legal
significance the supervisory defendants have attributed to it.
As this court has observed, "[e]ven elective treatment
recommended by a physician but not 'necessary' in life or health
saving sense, may be constitutionally mandated upon a prisoner's
election."  Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H.
1977) (Bownes, J.).  Thus, the fact that Lee only "suggested"
that Rand receive an orthopedic consultation for his shoulder did
not give the supervisory defendants the prerogative to reject
that suggestion outright.  Indeed, "a deliberate indifference
claim can lie where prison officials deliberately ignore the

20

medical recommendations of a prisoner's treating physicians."
Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005); accord
DesRosiers, 949 F.2d at 20 ("deliberate defiance of prison
doctor's express orders, solely for purpose of causing prisoner
unnecessary pain, could transgress the Eighth Amendment").

Anderson claims that, rather than ignoring Lee's suggestion,
she and Butler "determined that conservative treatment would be
pursued inside the jail, prior to any orthopaedic consultations."
Anderson Aff. ¶ 32.  The events surrounding the decision,
however, suggest that this is less of an honest explanation for
the decision than a post hoc justification of it.  First, neither
Anderson nor Butler claims to have asked Lee about the suggested
treatment before deciding that it did not amount to an "order"
and therefore could be disregarded.  Second, while Anderson
acknowledges that she and Butler "discussed having Dr. Rodd, the
jail's physician and medical director, review the case," Anderson
Aff. ¶ 12, they apparently did not, even though the MCHC's
medical policy at the time gave Rodd--and not Anderson, Butler,
or any other administrator--the ultimate authority to decide
whether a treatment was medically necessary.

Third, Butler's notations on Rand's chart do not reflect the
choice of "a more conservative course of treatment" for Rand.
Instead, on March 11, 2004, just after her conference with

Anderson, Butler wrote, "Will hold off on surgical consult for now-awaiting court rulings/court dates."  Butler Aff. ¶ 15. Fourth, and most importantly, when Butler saw Rand on March 19, 2004, she did not tell him that "a more conservative course of treatment" had been chosen for his shoulder injury.  To the contrary, she said that "this pre-existing condition will not be authorized for surgical intervention" and that "he would have to write directly to Carole Anderson for authorization for outside consult."  <u>Id.</u> ¶ 16.  Finally, in explaining the MCHC's decision to Moyer, Doucet also relied on the fact that Rand's injury was a pre-existing condition and, as a result, the MCHC would not provide treatment unless Rand could pay for it.

"Prison officials may not, with deliberate indifference to the serious medical needs of an inmate, opt for an easier and less efficacious treatment of the inmate's condition.  Nor may they condition provision of needed medical services on the inmate's ability or willingness to pay."  <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks and citation omitted).  At a minimum, the evidence just surveyed creates an issue of fact as to whether the supervisory defendants denied outside care to Rand on these prohibited bases.  <u>See</u> <u>Johnson</u>, 412 F.3d at 404-05 (reversing summary judgment for the defendants on deliberate indifference

claim arising out of refusal to allow medication recommended by plaintiff's treating physician where, inter alia, they failed to investigate whether it would be "medically appropriate" to disregard recommendation).  The court therefore cannot grant summary judgment on the ground that the supervisory defendants did not act with the requisite degree of indifference.

The supervisory defendants also argue, however, that Rand cannot show that he had a "serious medical need," because the eventual examination of his shoulder by medical providers outside the prison showed that he did not have the rotator cuff tear diagnosed by Lee, or, in fact, any other significant injury.  The First Circuit has instructed that "[t]he 'seriousness' of inmate's needs may . . . be determined by reference to the effect of the delay of treatment." Gaudreault, 923 F.3d at 208 (citing Monmouth County, 834 F.2d at 347).  Under this test, a medical need is considered "serious" when the delay in treating it causes "unnecessary and wanton infliction of pain" or "a life-long handicap or a permanent loss . . . ." Monmouth County, 834 F.2d at 347 (internal quotation marks omitted).

Here, although the supervisory defendants initially refused to send Rand to an orthopedic surgeon in accordance with Lee's suggestion of March 11, 2004, he was ultimately examined by specialists outside the jail on January 14, 2005, February 23,

23

2005, and May 18, 2005.  These specialists concluded that Rand
had neither a serious cervical injury nor a significant rotator
cuff tear.  They also did not believe that surgery was an
appropriate intervention, recommending physical therapy and a
decrease in Rand's pain medication instead.  Even these measures,
however, did not appreciably reduce Rand's pain and discomfort,
so implementing them earlier would not have measurably improved
his physical condition.

The delay in getting examined by an orthopedic surgeon,
then, did not cause Rand any additional pain or permanent injury.
Cf. Monmouth County, 834 F.2d at 347.  In fact, between March 19,
2004, when Butler told Rand that he could not undergo surgery or
any other outside treatment on his shoulder without Anderson's
say-so, and December 9, 2004, when Lee ordered a CT scan of
Rand's spine, Rand sought medical care for his shoulder only
once, on November 11, 2004.  Even on that date, Lee reported that
Rand's symptoms appeared to have improved.  Because the summary
judgment record demonstrates that Rand suffered no ill effects
from the delay in receiving outside care for his shoulder, his
injury did not amount to a "serious medical need" as a matter of
law.  See Gaudreault, 923 F.3d at 208-09 (affirming summary
judgment for defendants on deliberate indifference claim arising
out of delay in providing medical care when doctor who eventually

24

examined inmate "saw no need for immediate treatment," including surgery, and "counseled patience").  The supervisory defendants are therefore entitled to summary judgment on that basis.

Conclusion

For the foregoing reasons, Simonds's motion for summary judgment for Rand's failure to exhaust administrative remedies (document no. 52) is GRANTED; Rand's claim against Simonds is dismissed without prejudice.  The supervisory defendants' motion for summary judgment (document no. 54) is also GRANTED as follows:  Rand's claim against the supervisory defendants, to the extent it arises out of Simonds's actions, is dismissed without prejudice; the supervisory defendants are otherwise granted summary judgment as to Rand's claim.  The remaining pending motions (document nos. 53, 65, and 66) are DENIED as moot.  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

March 22, 2006

cc:  James E. Rand, pro se
     Kenneth C. Bartholomew, Esquire
     John A. Curran, Esquire
     Michael A. Pignatelli, Esquire